# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CHARLES LYTE,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :      **No. 3:04CV1244(DJS)** |
| | : |
| **SOUTH CENTRAL CONNECTICUT** | : |
| **REGIONAL WATER AUTHORITY,** | : |
| | : |
| **Defendant.** | : |

## MEMORANDAUM OF DECISION AND ORDER

On July 26, 2004, the plaintiff, Charles Lyte ("Lyte"), filed this action alleging that his employer, the South Central Connecticut Regional Water Authority ("RWA"), discriminated against him on the basis of his race and color and retaliated against him for opposing race discrimination in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e et seq. In addition to these claims, Lyte also asserts that RWA discriminated against him because of his race, color, disability, and previous opposition to discriminatory practices in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1) and (4). On October 3, 2005, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), RWA filed a motion for summary judgment (dkt. # 22). For the reasons set forth herein, RWA's motion **(dkt. # 22)** is **GRANTED**.

## I. FACTS

Lyte is a black male who was born in British Guiana. He holds an associate's degree in data processing and has earned additional credits towards a bachelor's degree. On or about May 1, 1999, RWA hired Lyte as a senior programmer analyst in the information systems department ("ISD"). He was responsible for enhancing and developing application programs for RWA's

customer service and new business development departments. George Olt ("Olt"), Lyte's former supervisor, gave Lyte a positive performance review, dated November 28, 2001, for Lyte's work performance for the period of January 1, 2001 to November 27, 2001.[1] (See dkt. # 32, Ex. # 3.)

The parties agree that RWA changed Lyte's title from senior programmer analyst to system analyst during the month of November, 2001. (See dkt. # 22-3; dkt. # 32, Ex. 11, Lyte Aff. ¶ 2-4.) According to RWA, this change was part of an ISD "reorganization"[2] and that "[p]art of the reorganization of our [information systems] department was Mr. Lyte's transition from COBOL[3] development to a position involving package application support." (Dkt. # 22, Ex. C, Burns Aff. ¶ 3.) RWA also maintains that Lyte agreed to this position change and, that as a result of this change, he began reporting to Patricia Burns ("Burns"). Lyte testified that this move was akin to a promotion because the title "systems analyst" is a "higher job classification" than the title "senior programmer analyst." (Id., Ex. B, Lyte Dep. at 165:7-25; dkt. # 32, Ex. 11, Lyte Aff. ¶ 4.) A December 26, 2001 email sent by Lyte to his new supervisor, Burns, which was entitled "System Analyst Position," reads,

> George Olt did not explained [sic] the change to my job description as a new position. He explained it was a correction to description of the role I currently performed at RWA, with expanded opportunities to gain project management skills and obtain more exposure to users and RWA business systems.

(Dkt. # 22, Ex. D.)

---

[1] Although RWA does not dispute that Olt gave Lyte a positive performance review, it asserts, "[t]he purportedly 'glowing' performance review was written by Mr. Olt three days before his voluntary resignation took effect. Olt was not personally invested in the future success of SCCRWA and therefore at that time had no reason to be anything but cordial." (Dkt. # 33-1) (internal citations omitted).

[2] Lyte counters that he was unaware of any "reorganization."

[3] COBOL is a software programming language.

In addition to arguing that RWA changed his title in November, 2001, Lyte also argues that RWA subsequently demoted him. He provided the following deposition testimony regarding his title,

A.    My title change [sic] from senior programmer analyst to application analyst.

Q.    And was application analyst your title up until the time that you left the Water Authority?

A.    Yes.

Q.    And when did that change of title occur?

A.    I really do not know. It's complicated because my - - George Olt put on the performance review that my title is changed from an application analyst to - - from a senior programmer analyst to system analyst. System analyst, just understand that phrase [sic].

Q.    Uh-huh.

A.    After he left, between the hiring of a new vice-president and a year later, something was given to me just before I filed a complaint saying my title is not assistant analyst, but an application analyst, which is totally different . . . . So I would say that change occur [sic] almost a year after my performance review sometime just before I filed my complaint.

(Id. at 49:11-50:5.) With respect to his demotion, Lyte further testified,

Q.    What led you to that conclusion, that it was a demotion?

A.    Because the previous position I had as a senior programmer analyst was paying [$] 12 to [$] 15,000 more than the new position of application analyst.

Q.    And first, how do you know that that title that you received paid that [$] 12 or [$] 15,000 less?

A.    Because when they fire [sic] me with the job description nine months after George Olt was there, it has a base salary range that came on the same form with it. That was the first time I'd seen it.

Q.    And was your salary at that time within that range?

A. Yes.

Q. And was your salary lowered from what it had been previously?

A. No.

Q. And what was the salary pay arrangement for the initial position that you had with the Water Authority?

A. The senior programmer analyst came out as about up to $72,000 and application analyst stopped at [$] 60 - - [$] 75, and the application analyst stopped at, I think [$] 62. There was like a [$] 3,000 ceiling between the two.

Q. And when did you see that for the first time?

A. When they give me the job description sometime in October of 2002, sometime around there.

Q. So they changed your title, but they didn't change your pay; is that correct?

A. Correct.

(Id. at 66:21-68:7.)

The documentary evidence before the court contains different descriptions of Lyte's title for the period of May, 1999 to June, 2003. For instance, the Regional Water Authority's Job History Report for Charles Lyte ("the Job History Report") indicates that Lyte held the position of "programmer/application analyst" from 1999 to 2002. The Job History Report shows that Lyte was hired as a "programmer/application analyst" on May 17, 1999, and was paid a salary of $50,000.08. It also indicates that Lyte continued to hold the position of "programmer/application analyst" on January 1, 2000, when his salary was increased to $52,300.00; on January 1, 2001, when his salary was increased to $55,000.00; and on January 1, 2002, when his salary was increased to $56,650.00. (See dkt. # 32, Ex. 3.) The employee performance review completed by Olt and dated November 28, 2001, contains a different description of Lyte's position because

it classifies Lyte as an "application systems analyst." (Id.) Lyte's Employee Warning Notice of August 23, 2002, however, classifies him as a "systems analyst," (see dkt. # 22, Ex. K), and Lyte's Employee Performance Review of November 15, 2002 categorizes him as a "programmer/system analyst," (Id., Ex. L). Lastly, a letter dated June 23, 2003, from Human Resources Manager Richard Brown ("Brown") to Lyte, states that Lyte was a "programmer/application systems analyst." (See dkt. # 32, Ex. 13.)

Lyte alleges that beginning in December 2001, soon after he was assigned to report to Burns, she subjected him to harassment, differential treatment, and retaliation. Burns served as Lyte's supervisor when he worked on RWA's "Interactive Voice Response" ("IVR") system project with Fujitsu, an outside corporate vendor. Lyte handled application development and worked extensively with Fujitsu's lead programmer, John Fitzgerald ("Fitzgerald"). Fujitsu tasked Fitzgerald with writing and installing custom computer programs. The IVR project ran behind schedule and was not completed until March 2002, after the replacement of both Fujitsu and Fitzgerald. The parties dispute the quality of Lyte's and Fitzgerald's work. In her affidavit, Burns avers, "[g]enerally, Fitzgerald's primary technical contact person at the Water Authority was Mr. Lyte, and together they were chronically unable to resolve the programming problems." (Id., Ex. 1, Burns Aff. ¶ 17. ) RWA contends that it had to hire a new programmer to rewrite Fitzgerald's programs. The parties agree that the programs for which Fitzgerald was responsible were not finished almost two and a half months after the initial delivery deadline of May 28, 2001. (See dkt. # 29.) Lyte testified that any problems with the IVR project were caused by defects in the third-party software.

Lyte alleges that he promoted cultural diversity and understanding in the workplace and accuses his managers of being insensitive to diversity issues. He also accuses Burns of making

what he considers to be racially disparaging remarks. According to Lyte, Burns said that Fitzgerald was "overpaid" and that Fitzgerald's work was "garbage." (Dkt. # 22, Ex. B., Lyte Dep. at 57:5-7; 91:25.) Indeed, Lyte provided the following deposition testimony regarding Burns's comments:

> Q.  Did you ever hear Ms. Burns say anything that, to you, seemed derogatory about the Fujitsu employee John Fitzgerald?
>
> A.  Yes, and she sent a - -
>
> MS. JENNINGS:  Excuse me. That's a yes or no question.
>
> A.  Yes, yes.
>
> Q.  What sort of things did you hear her say?
>
> A.  He's being overpaid.

(Dkt. # 22, Ex. B, Lyte Dep. at 87:24-88:7.) Lyte further testified,

> Q.  Other than Ms. Burns saying that that Fujitsu employee, John Fitzgerald - - other than saying that John Fitzgerald is overpaid, did you ever hear her say anything else negative about him, or that you felt was derogatory?
>
> A.  She said his work was garbage.
>
> Q.  Okay.
>
> A.  And they had to - - his work was garbage.
>
> Q.  You're saying that's what she said, of course.
>
> A.  Yes.
>
> Q.  And what prompted her to say at that time, if you know?
>
> A.  Because when they hired a new - - when the company [Fujitsu] was going out of business in December 2002, I assume, we [ RWA] were looking for another company to take over the project and keep it going, and they make [sic] arrangement to hire somebody that was working  - - Fitzgerald to be the consultant to finish the project, because John [Fitzgerald] [was]

> terminated when the company end [sic]. And I think the other guy said he
> had to rewrite, redo everything John [Fitzgerald] did.
>
> Q.    And do you think that her saying that his work was garbage was based on
>       what the other programmer told her, that he had to write everything that
>       Fitzgerald had written?
>
> A.    She told me the other programmer said that. I didn't know what the other
>       programmer told her.
>
> Q.    I understand. What I'm asking is, do you believe that she said that
>       Fitzgerald's work was garbage because when she said that she was told
>       that it [the program] had to be rewritten?
>
> A.    I believe that she said it was because he was a black man. We always got.
>       . . .
>
> Q.    What leads you to that conclusion?
>
> A.    Because my experience in IT is like, we always got throwed [sic] in the
>       fire fight, and never get credit for our performance. When something is
>       wrong, I've seen that there was no justification to say that, because when
>       the other guy came on board, after three months, he had exactly the same
>       problem that they said was garbage.

(Id. at 91:20-93:10.) Lyte asserts that these comments show that Burns was "labeling" Fitzgerald

because he is black. (Id. at 92:22-93:2.) Lyte testified that he confronted Burns after she made

these statements and asked her if she was racist. In addition, Lyte argues that Burns's statement

regarding the poor quality of Fitzgerald's work was also a reflection on his own work because the

two men, who were both black, worked together on the IVR project. Burns and RWA deny that

Burns made or wrote any racially disparaging or derogatory remarks. During his deposition, Lyte

also testified that he did not remember anyone else at RWA, other than Burns, saying anything

negative or derogatory about Fitzgerald. (Id. at 96:8-11.) In addition, when asked, "Did you ever

hear anyone at the Water Authority, any employee, ever say anything negative, derogatory, that

seemed to be based on racial prejudice?" Lyte responded, "No." (Id. at 96:12-15.)

The parties dispute Lyte's work schedule and the quality of Lyte's work. Burns asserts, "[a]t that time [November 2001], the then Chief Technology Officer, George Olt, and myself [Burns], met with Mr. Lyte and explained that his new position required adherence to core office hours, 8 a.m. to 5 p.m." (Dkt. # 22, Ex. C, Burns Aff. ¶ 3.) Although Lyte argues that RWA had a past practice that allowed IT employees to arrive at work after 8 a.m., he does not dispute that Burns sent him an email on December 26, 2001, which explained that he was required to adhere to normal business hours of 8:00 a.m. to 5:00 p.m., Monday through Friday. (See dkt. # 29, ¶ 6.) Burns's email reads, "users require system support during normal business hours," and "flex time will be dealt with on a case by case basis." (Dkt. # 32, Ex. 10.) It further states, "if you need to adjust your hours, please notify me prior to the particular day so that I may ensure proper coverage for your systems." (Id.) In his email response, Lyte agreed to meet the core ISD working hours and indicated that he expected to work after 5:00 p.m. as well as on weekends to meet the demands of system users. (Id.)

RWA contends that Lyte did not adhere to the 8 a.m. to 5 p.m. schedule. (See dkt. # 32, Ex. 1, Burns Aff. ¶ 6.) In support of this contention, RWA submits a print-out of Lyte's key card entry sheets for the period of January 2, 2002 to May 21, 2002. The printouts indicate that Lyte arrived on-time (at or before 8:00 a.m.) only nine times. (See dkt. # 22, Ex. I.) Lyte alleges that the key card tracking system is an inaccurate measure of an employee's time at work because the printouts submitted to the court did not reflect the instances he worked weekends for the period of January 2, 2002 to May 21, 2002. In addition, Lyte notes that although some of the records submitted to the court show entries for "lunch out/lunch in," they do not contain an initial entry for "time in." Likewise, he states that although, in some instances, there are entries for "lunch in," there are not initial, corresponding entries for "lunch out." (Dkt. # 32, Ex. 14.)

On February 4, 2002, Lyte sent Burns an email, which explained that he had arrived to work late (at 10:00) and intended to leave early (between 15:00-17:00) because he had accumulated "comp time" over the weekend. (Dkt. # 22, Ex. E.) The parties agree that the week of February 4, 2002, had been an extremely tight work week because an IVR-related deadline was approaching. In an email response, Burns wrote that she did not approve of this behavior and referred Lyte to Human Resources if he had questions regarding RWA's policy for "flex time" or "comp time." Lyte later sent Burns a reply email also dated February 4, 2002, which reads, "I came to work today at 10:00 and I'm leaving at 23:30." (Id.)

RWA claims that less than a week later, on February 7, 2002, Lyte missed a meeting when he left the office unannounced to conduct personal business and failed to take his pager with him. Lyte claims that prior to the meeting, Burns told him that she would present the system and that it was not necessary for him to attend the meeting. (See id., Ex. B, Lyte Dep. at 93:24-95:6.) Indeed, Lyte accuses Burns of telling him not to attend the meeting so that she could take credit for his project. Subsequent to the meeting, Chief Technology Officer Janet Ryan ("Ryan") reprimanded Lyte and told him not to leave RWA without his beeper.

Lyte sent Richard Brown ("Brown"), the Manager of Human Resources, an email dated March 19, 2002, which raised the following concerns: (1) Lyte was having difficulty with Burns; (2) Lyte had an appointment with Burns and Ryan at 2 p.m. on March 19th; (3) Lyte believed that the way some managers were trained in cultural diversity awareness and appreciation for diversity in the work environment was a serious problem; and (4) Lyte believed that HR guidance could be helpful at the meeting. In response, Brown sent Lyte an email explaining that Brown did not think that he should intervene before Lyte's meeting with Ryan and Burns. Brown also

wrote that if, after discussing the issues with Burns and Ryan, Lyte still had concerns, then Lyte should contact Brown. (Dkt. # 32, Ex. 4.)

On or about May 1, 2002, and May 3, 2002, Lyte emailed Ryan and CEO David Silverstone ("Silverstone") regarding the lack of advancement on diversity issues at RWA. Silverstone and Lyte subsequently met in early May, 2002 for forty-five minutes.

Thereafter, on May 17, 2002, at 8:06 a.m., Burns sent Lyte an email, which informed him that he had to attend a meeting that morning, which would commence at 9:00 a.m. Lyte arrived at the office at 9:04 a.m. and ultimately went to the meeting thirty minutes late. On the same day, Lyte left the office from approximately 12:41 p.m. to 2:55 p.m. without permission. As a result of these actions, Burns gave Lyte a written employee warning notice, dated May 28, 2002, which was signed by both Burns and Lyte. The warning notice also detailed new conditions that would be imposed upon Lyte, including a thirty-day probationary period. Burns subsequently emailed Lyte, Brown, and Ryan to inform them that Lyte would now report to the office from 8:00 a.m. to 5:00 p.m., that he would take only one hour for lunch and that Lyte should not be granted "flex time" or "comp time" without prior permission from Burns. Lyte filed his first of three CHRO complaints on or about May 30, 2002. He alleged that Burns discriminated against him, in the written warning of May 28, 2002, because of his race.

Lyte claims that although he spoke, in June 2002, to RWA's technical support staff about remote access to the IT system from home, RWA did not act upon his request. Lyte also asserts that other IT employees had remote access at their homes and were able to work from home. In his affidavit, Lyte avers, "I was the only IT employee that did not have this privilege, and I was the only African-American IT employee." (Id., Ex. 11 Lyte Aff. ¶ 68.)

On June 17, 2002, Ryan filed a memorandum regarding Lyte's tardiness and work performance problems for the period of January 28, 2002 to June 17, 2002. RWA also offers a second employee warning notice, dated August 23, 2002. Although it does not appear that this notice was signed by either Burns or Lyte, it references Lyte's work performance problems dating back to April 2002. The notice states that Lyte was placed on probation for failure to work a standard day; however, it also observes that during the month of June 2002, Lyte adhered to a standard day. In the notice, Burns comments that Lyte lacked "good oral and written communication" skills as well as "good judgment." (Dkt. # 22, Ex. K.) She also wrote that although she had counseled Lyte on practical ways to increase his productivity and effectiveness, Lyte "remain[ed] highly resistant to constructive feedback," and did not show substantial improvement. (Id.)

Lyte claims that he suffered an emotional and mental breakdown as a result of the stress caused by his job at RWA. Brown granted, on November 4, 2002, Lyte's request for medical leave in accordance with the request of Lyte's doctor, Annemarie Murphy ("Dr. Murphy")

On November 15, 2002, Burns completed an employee performance review, which graded Lyte's work performance in eight categories for the period of January 1, 2002 to November 11, 2002. The document classified Lyte as a "programmer/system analyst." (Id., Ex L.) He received an overall assessment rating of "poor" in four categories; "below average" in one category; "average" in one category; and "above average" in two categories. Lyte's "poor" grade corresponded to the following categories: (1) quality, quantity & reliability of work; (2) job knowledge; (3) planning & initiative; and (4) supervision & empowerment. In the category of teamwork & cooperation, Lyte received a "below average" grade. He was also ranked "average" in customer service and "above average" in both creativity & innovation and commitment to

diversity.  (Id., Ex. B, Lyte Dep. at 131-132.)  Lyte claims that he never saw this performance review.

On March 18, 2003, Lyte met with Brown to discuss his return to work.  RWA agreed to accommodate Lyte's request for part-time status and on April 7, 2003, Lyte returned to RWA on a part-time basis.  Two weeks later, however, Lyte resumed his leave of absence.  Prior to his brief return to RWA in April, 2003, Lyte filed his second CHRO complaint dated April 2, 2003, which alleged demotion and retaliation.

In a letter to Lyte dated May 12, 2003, Brown explained that Lyte had exhausted his sick time pay as of May 9, 2003, and that Lyte would therefore be required to return to work full-time in order to resume regular wages.  (Id., Ex. M.)  Brown also noted that Lyte could elect to apply for Long Term Disability.  Then, on June 20, 2003, RWA disabled Lyte's access card. Thereafter, in a letter to Lyte dated June 23, 2003, Brown explained that Lyte would be terminated on June 30, 2003, unless he was able to return to work on a full-time basis and satisfactorily perform the essential duties of his job.  The letter reads,

> unless you are able to return to work on a full-time basis and satisfactorily perform the essential functions of your job by the end of this month, which we understand to be unlikely, your employment with South Central Connecticut Regional Water Authority will terminate at the close of business on June 30, 2003.

(Id., Ex. N.)  The letter also states, "If you wish an opportunity to explain anything in person before a termination decision is final, we will be glad to meet with you on Friday, June 27 at 2:00pm in the Human Resources Conference Room."  (Id.)

On June 25, 2003, Lyte sent an email to Ryan and Brown, which stated that he would return to work the following day, June 26, 2003.  When Lyte returned to RWA, on June 26, 2003, an armed guard met him at the door.  The guard escorted Lyte to an office.  Brown and

Ryan then briefly met with Lyte, while the guard waited outside the doorway. They asked Lyte to return the next day, June 27, 2003, at 2:00 p.m. to discuss his employment at RWA. Lyte was also asked to have his doctor submit a note stating that he could return to work. Lyte contacted Dr. Murphy who faxed a note to Brown on June 26, 2003. After receiving Dr. Murphy's fax, Brown emailed Dr. Murphy on June 26, 2003, and asked for her professional opinion regarding Lyte's ability to return to work "completely functional on a full-time basis." (Dkt. # 32, Ex. 20.) Dr. Murphy responded the next day, and confirmed Lyte's capability of returning to work full-time but asked for clarification on the meaning of "completely functional" as defined by RWA's policy. (Id.)

Lyte did not return to RWA for the 2:00 p.m. meeting on June 27, 2003. (Dkt. # 22, Ex. B, Lyte Dep. at 144:25-145:6.) Indeed, during his deposition, Lyte was asked, "So did you go to that 2 p.m. meeting that afternoon on the 27th?" (Id. at 144:25-145:1.) Lyte responded, "I had no intentions [sic] of going back to RWA for a meeting when I am not sure that I am going to be facing a cop with a gun anymore, and I told them I want to know my employment status before I come back to the conference. If I'm not employed, tell me." (Id. at 145:2-6.)

In a letter to Lyte dated June 27, 2003, Brown wrote that Lyte's employment with RWA would be terminated at the close of business on June 30, 2003. Following his termination, Lyte filed a third complaint with the CHRO alleging that his termination was discriminatory and retaliatory. After issuance of a right to sue letter, Lyte filed this lawsuit.

## II. DISCUSSION

Lyte claims that, in violation of Title VII of the Civil Rights Acts of 1964, RWA discriminated against him on the basis of his race and color and in retaliation for previously opposing discrimination. He also asserts that RWA discriminated against him on the basis of

race and disability and in retaliation for previously opposing RWA's discriminatory practices in violation of the Connecticut Fair Employment Practices Act ("CFEPA").  RWA argues that Lyte has not brought forth sufficient evidence to sustain his Title VII and CFEPA claims.  For the reasons set forth herein RWA's motion is granted.

## A. STANDARD OF REVIEW

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burdens of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).  A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

## B. RACE DISCRIMINATION CLAIMS

Lyte alleges that RWA discriminated against him because of his race and color by subjecting him to harassment, demotion, and termination. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee on the basis of an employee's race or color. 42 U.S.C. §§ 2000e et seq. The CFEPA also makes it unlawful for employers to discriminate against their employees because of race or color. Conn. Gen. Stat. § 46a-60(a)(1). The Connecticut Supreme Court looks to federal precedent for interpreting and enforcing the CFEPA. Levy v. Comm'n of Human Rights and Opportunities, 236 Conn. 96, 103 (1996); Brittell v. Dep't of Corr., 247 Conn. 148 (1998). Accordingly, the court will analyze Lyte's Title VII and CFEPA race discrimination claims together.

In McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802 (1973), the Supreme Court established an "allocation of the burden of production and an order for the presentation of proof in Title VII cases." Under that framework, a plaintiff alleging a violation of the discrimination statutes establishes a prima facie case by showing he (1) was a member of a protected class; (2) was qualified for the position he held; (3) suffered an adverse employment action; (4) in circumstances giving rise to an inference of discrimination. See Schnabel v. Abrahamson 232 F.3d 83, 87 (2d Cir. 2000); see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1985). If the plaintiff establishes a prima facie case, the employer has the burden of articulating a "legitimate, nondiscriminatory reason" for the adverse employment action. Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997). If the employer does so, the plaintiff must prove by a preponderance of the evidence that the employer's proffered explanation is unworthy of credence, and that the true reason for the employer's action was discrimination. See id.

Although Lyte argues that RWA discriminated against black employees, his claims of race discrimination fail as a matter of law because he cannot prove that he was terminated in circumstances giving rise to an inference of discrimination.[4]  Lyte argues that he can satisfy the fourth prong of the prima facie case because, according to Lyte, (1) RWA treated him differently from similarly situated IT employees, and (2) Burns allegedly made racially disparaging remarks. For instance, Lyte testified that RWA assigned black employees the most difficult projects and failed to credit them for their performance.  In addition, he averred that he was the only IT employee who was black and that he was the only IT employee who did not have remote access to the IT system.  (See dkt. # 32, Ex. 11 Lyte Aff. ¶ 7.)  Lyte also asserts that his training allowance, the amount of funding delegated to each employee for conferences and training, was half of what was allotted to other employees.  Lastly, he argues that although he was required to adhere to an 8:00 a.m. to 5:00 p.m. schedule and report the time of his lunch period, similarly situated IT employees were not subject to these restrictions.

"In order for employees to be similarly situated for the purposes of establishing a plaintiff's prima facie case, they must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's."  Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96 (2d Cir. 1999) (internal quotations and citations omitted).  Indeed, "the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  Graham v. Long Island R.R., 230 F.3d 34, 40 (2d. Cir. 2000) (internal citations and quotations omitted). This means that "where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation

---

[4] The parties do not dispute that Lyte satisfied the first three prongs of the prima facie case.

sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 54 (2d Cir. 2001). Here, Lyte has not even named the employees that he claims RWA treated more favorably. Nor did he show how any of these employees were similarly situated to him. Thus, the court cannot discern if Lyte and the other IT employees held positions of similar rank. Accordingly, Lyte has not established that he was similarly situated in all material respects to the individuals with whom he seeks to compare himself.[5] As such, Lyte cannot establish a <u>prima facie</u> case of race discrimination by making reference to the disparate treatment of other employees.

Lyte's reliance upon Burns's allegedly racially disparaging remarks about Fitzgerald also does not raise an inference of discrimination. With respect to Burns's comments, Lyte provided the following deposition testimony:

> Q. Did you ever hear Ms. Burns say anything that, to you, seemed derogatory about the Fujitsu employee John Fitzgerald?
>
> A. Yes, and she sent a - -
>
> MS. JENNINGS: Excuse me. That's a yes or no question.
>
> A. Yes, yes.
>
> Q. What sort of things did you hear her say?
>
> A. He's being overpaid.

(Dkt. # 22, Ex. B, Lyte Dep. at 87:24-88:7.) Lyte further testified,

> Q. Other than Ms. Burns saying that that Fujitsu employee, John Fitzgerald - - other than saying that John Fitzgerald is overpaid, did you ever hear her say anything else negative about him, or that you felt was derogatory?

---

[5] In addition, the court observes that, with respect to Lyte's race discrimination claim, Lyte does not challenge RWA's assertion that it terminated a similarly situated white employee, Malcolm Graham, for performance reasons.

A.    She said his work was garbage.

Q.    Okay.

A.    And they had to - - his work was garbage.

Q.    You're saying that's what she said, of course.

A.    Yes.

Q.    And what prompted her to say at that time, if you know?

A.    Because when they hired a new - - when the company [Fujitsu] was going
      out of business in December 2002, I assume, we [ RWA] were looking for
      another company to take over the project and keep it going, and they make
      [sic] arrangement to hire somebody that was working  - - Fitzgerald to be
      the consultant to finish the project, because John [Fitzgerald] [was]
      terminated when the company end [sic].  And I think the other guy said he
      had to rewrite, redo everything John [Fitzgerald] did.

Q.    And do you think that her saying that his work was garbage was based on
      what the other programmer told her, that he had to write everything that
      Fitzgerald had written?

A.    She told me the other programmer said that.  I didn't know what the other
      programmer told her.

Q.    I understand.  What I'm asking is, do you believe that she said that
      Fitzgerald's work was garbage because when she said that she was told
      that it [the program] had to be rewritten?

A.    I believe that she said it was because he was a black man.  We always got.
      . . .

Q.    What leads you to that conclusion?

A.    Because my experience in IT is like, we always got throwed [sic] in the
      fire fight, and never get credit for our performance.  When something is
      wrong, I've seen that there was no justification to say that, because when
      the other guy came on board, after three months, he had exactly the same
      problem that they said was garbage.

(Id. at 91:20-93:10.)  Burns statements, i.e., that Fitzgerald was "overpaid" and that his work was

"garbage," on their face, are not indicative of discrimination.  Despite this, Lyte argues that

Burns's remarks are illustrative of "labeling."  Indeed, Lyte contends that Burns was "labeling" Fitzgerald because he is black.  The Second Circuit recently observed that "[t]he relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by the assumptions or attitudes relating to the protected class.  Inoffensive remarks may strongly suggest that discrimination motivated a particular employment action."  Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 116 (2d Cir. 2007).  Here, however, Lyte has not shown how Burns's remarks are even remotely related to RWA's employment action.  Even assuming that Burns had been motivated by an attitude about the protected class, Lyte has not offered any evidence showing that it was Burns's decision to terminate his employment or that Burns was in any involved in the decision to terminate Lyte.  Nor does he challenge the portion of Burns's affidavit in which she avers, "[i]n November 2002, the Plaintiff [Lyte] requested and was granted a medical leave.  I was advised that he was going to return to work sometime in June 2003."  (Dkt. # 22, Ex. C, Burns Aff. ¶ 25.)  Burns's uncontroverted statement reveals that she was not the one who decided whether and when Lyte could return to RWA.  Indeed, Lyte does not dispute that it was Brown, and not Burns, who sent him the letter of June 23, 2003.  The letter of June 23, 2003 explained that Lyte would be terminated, effective June 30, 2003, unless he was able to return to work on a full-time basis and satisfactorily perform the essential duties of his job.  In addition, the record evidence before the court indicates that Burns was not present at the meeting of June 26, 2003, during which Brown and Ryan instructed Lyte to leave the premises and return to RWA the following day at 2:00 p.m.  Finally, Burns's comments were made approximately a year-and-a-half prior to Lyte's termination.  Accordingly, the court is not persuaded that Burns's comments are sufficient to raise a reasonable inference of discrimination.  As such, Lyte has not satisfied his initial burden.

Assuming arguendo that Lyte has met his burden with respect to all the elements of a prima facie case, he has failed, in any event, to meet his burden under the McDonnell Douglas burden shifting analysis of producing evidence that the RWA's articulated, non discriminatory reasons for his termination are pretext for race discrimination. RWA has met its burden of showing that there were legitimate, non-retaliatory reasons for Lyte's termination. For instance, RWA has produced documentary evidence that Lyte was terminated for (1) failing to return to work following the expiration of his leave period; (2) failing to adhere to his schedule; and (3) exhibiting a gradual degradation in his work over time. RWA's specific and substantiated offer of proof forces Lyte to prove that RWA's proffered reasons were pretextual and that a discriminatory motive played a role in RWA's decision to terminate him. Lyte argues that he can show pretext because, according to Lyte, (1) RWA offered "varying" and "inconsistent" reasons for his termination; (2) RWA prevented him from returning to work; (3) he adhered to his work schedule; and (4) his work did not exhibit a gradual degradation over time. None of these allegations, however, either individually or in the aggregate, suffice to demonstrate that RWA's proffered explanations were pretext for race discrimination.

A jury question on the issue of pretext may be created when an employer offers inconsistent and varying explanations for terminating an employee. Roge v. NYP Holdings, Inc., 257 F.3d 164 (2d Cir. 2001); Norville, 196 F.3d at 89; EEOC v. Ethan Allen, Inc., 44 F.3d 116 (2d Cir. 1994). Lyte argues that RWA has over time given varying and inconsistent explanations for his termination. For example, Lyte asserts that RWA listed, in its EEOC Position Statement, (see dkt. # 32, Ex. 7), Lyte's failure to return to work following a leave of absence as the only reason for his termination. Then, in the Fact Finding Supplement that RWA completed in connection with Lyte's unemployment claim, RWA maintained that Lyte was terminated because

of his "inability to sustain adequate performance." (See dkt. # 32, Ex. 8.) Thus, Lyte argues that RWA has advanced "shifting" reasons for his termination. Lyte's argument fails, however, because RWA did not raise Lyte's "inability to sustain adequate performance," for the first time, in the Fact Finding Supplement. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (finding an issue of fact with regard to the veracity of an employer's non-discriminatory reason for discharging plaintiff when the employer first maintained, in an EEOC proceeding, that the plaintiff was terminated because of a reduction in force and then, in litigation, maintained that he was terminated because of the reduction in force and because of his poor work performance). Carlton is factually distinguishable from the case presently before the court. In Carlton, the Second Circuit found that although the employer stated, during the course of litigation, that Carlton was let go for performance reasons, Carlton had never received a negative written performance evaluation or formal warning. Thus, the Second Circuit found that the employer's argument that it had fired Carlton due to his poor job performance "was an afterthought." Id. at 137. Here, the evidence before the court does not support Lyte's contention that RWA's articulated reason, i.e., that Lyte was unable to sustain adequate performance, was a mere "afterthought." Indeed, a review of the record indicates that, while Lyte was still employed by RWA, he received verbal warnings, emails, and written warnings regarding his punctuality and work performance. Thus, Lyte has not shown that RWA has, over time, offered inconsistent and varying explanations for his termination.

With respect to Lyte's claim that RWA prevented him from returning to work, he points to Brown's letter of June 23, 2003, which states:

> unless you are able to return to work on a full-time basis and satisfactorily perform the essential functions of your job by the end of this month, which we understand to be unlikely, your employment with South Central Connecticut

Regional Water Authority will terminate at the close of business on June 30, 2003.

(Dkt. # 22, Ex, N).   Lyte contends that after he received this letter, he attempted to return to work full-time.  In support of his argument that RWA prohibited him from returning to work following the expiration of his medial leave, Lyte offers evidence that: (1) RWA disabled his access card on Friday, June 20, 2003; (2) he sent Brown and Ryan an email dated June 25, 2003, which stated, "I will be returning to work tomorrow, June 26, 2003.  I will report to my office at 8:00AM," (dkt. # 32, Ex. 18); (4) he reported to RWA on June 26, 2003, but was escorted by a security guard; (4) Dr. Murphy twice informed RWA that Lyte could return to work full-time; and (5) Brown did not subsequently contact Dr. Murphy regarding Lyte's ability to return to RWA.  Despite these arguments, however, Lyte admits that when was asked, "[s]o did you go to that 2 p.m. meeting that afternoon on the 27th?"  (Id. at 144:25-145:1), he responded, "I had no intentions [sic] of going back to RWA for a meeting when I am not sure that I am going to be facing a cop with a gun anymore, and I told them I want to know my employment status before I come back to the conference.  If I'm not employed, tell me."  (Id. at 145:2-6.)  Lyte's deposition testimony makes no mention of how RWA "prevented him from returning to work."  Indeed, Lyte's testimony indicates it was Lyte who decided not to follow the directive to return to RWA on the 27th.  Moreover, the record evidence indicates that although Lyte returned to RWA, part-time, for two weeks in April 2003, thereafter, Lyte did not work and did not contact RWA even though he received RWA's letter of May 12, 2003, which informed him that he had exhausted his sick time pay as of May 9, 2003, and that he would therefore be required to return full-time to resume regular wages.  (See dkt. # 22, Ex. M.)  Thus, on June 20, 2003, when RWA disabled Lyte's access card, Lyte had not contacted RWA regarding his return to work for several months.

Based on the foregoing, there is simply insufficient evidence to support Lyte's contention that RWA prevented him from returning to work.

Lyte has not shown that there is a factual dispute surrounding whether he took liberties with his work schedule. Significantly, Lyte does not dispute that Burns sent him an email on December 26, 2001, which explained that he was required to adhere to normal business hours of 8:00 a.m. to 5:00 p.m., Monday through Friday. (Dkt. # 29, ¶ 6.) He also admits that he was placed on probation, on May 28, 2002, in part, for failing to work a standard day. Lyte alleges that the key card tracking system is an inaccurate measure of an employee's time at work, but he offers no independent evidence to support his assertion. RWA offers print-outs of Lyte's key card entry sheets for the period of January 2, 2002 to May 21, 2002, which show that Lyte arrived on-time (at or before 8:00 a.m.) only nine times. (See Dkt. # 22, Ex. I.) Accordingly, Lyte cannot show that RWA's statement that Lyte failed to work a standard day is unworthy of credence.

Lyte also disputes RWA's assertions that his work gradually declined over time and that this was another reason for his termination. Although Lyte offers his own assessment of his work product, he offers no other evidence in support of his assertion. Lyte's conclusory and subjective opinions of his own work product, however, are insufficient to create a triable issue of fact. See Wyatt v. Zuckerman, No. 93 Civ. 8027LTSHBP, 2005 WL 525256, at * 12 (S.D.N.Y. March 7, 2005). In addition, Lyte argues, "[b]efore Burns became my manager, and until my termination, Ms. Burns never discussed my work performance with me, either in a formal performance review or in any informal setting." (Dkt. # 32, Ex. 11, Lyte Aff. ¶ 15.) This assertion, however, is not supported by the record. For instance, Lyte does not dispute that the employee warning notice of May 28, 2002, (see dkt. # 22, Ex. J), was signed by both himself and

Burns. Furthermore, Lyte does not dispute that another employee warning notice was issued on August 23, 2002. (See dkt. # 22, Ex. K.) Lastly, Lyte's employee performance review of November 15, 2002, which graded his work performance from January 1, 2002 to November 15, 2002 and was completed after he commenced his medical leave, gave him an overall assessment rating of "poor." (See id., Ex. L.) Thus, there are no genuine issues of fact surrounding Lyte's work performance.

Even assuming that Lyte could establish pretext, which he has not, Lyte's claim still fails because he has not adduced any evidence from which a reasonable trier of fact could infer that racial prejudice motivated, in whole or in part, RWA's decision to terminate him. The ultimate question in an employment discrimination case is whether the evidence offered can reasonably and logically give rise to an inference of discrimination under all circumstances. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000); Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999). Where the plaintiff's evidence barely establishes a prima facie case, the prima facie case alone may not be sufficient to prove that it is more likely than not that discrimination, not defendant's proffered explanation, was the true motivation for the adverse employment action. See Reeves, 530 U.S. at 148 ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."); Stern, 131 F.3d at 312. Besides Lyte's membership in a protected class, his vague assertions that RWA treated black employees differently, and his allegations concerning Burns, he has offered no evidence that he was treated differently because of his race or color. Cf. Schnabel, 232 F.3d at 88 (observing that a comment by a co-worker describing plaintiff as "an older guy" is not probative of whether defendant's discharged plaintiff because of his age and

that beyond minimal proof required to establish a <u>prima facie</u> case, plaintiff had offered no evidence that he was discriminated against because of his age). In fact, during his deposition Lyte was asked, "Did you ever hear anyone at the Water Authority, any employee, ever say anything negative, derogatory, that seemed to be based on racial prejudice?" and he responded, "No." (<u>Id</u>. at 96:12-15.)

Lyte has not shown that racial discrimination played a role in RWA's decision to terminate him. Indeed, Lyte concedes that he met with his superiors on May 26, 2003, and that they told him to return the following afternoon at 2:00 p.m. Lyte did not attend the meeting, which was scheduled for 2:00 p.m., nor did he attempt to call his superiors to discuss his absence from the meeting or his return to work. When asked about his decision not to return to RWA for the meeting, he testified that he "had no intentions [sic] of going back to RWA for a meeting when [he was] not sure that [he was] going to be facing a cop with a gun anymore, and [he] told them [he] want[ed] to know [his] employment status before [he came] back to the conference." (Dkt. # 22, Ex. B, Lyte Dep. at 145:2-6.) Thus, construing the evidence in a light most favorable to the plaintiff, the actions of his supervisors may have annoyed and aggravated him, but absent any evidence of racial overtones these actions are not discrimination. <u>Cf.</u> <u>Schnabel</u>, 232 F. 3d at 91 ("summary judgment was appropriate in the case at bar, for plaintiff has presented no evidence upon which a reasonable trier of fact could base the conclusion that age was a determinative factor in defendants' decision to fire him."). Accordingly, RWA's motion for summary judgment on Lyte's race discrimination claims is **GRANTED.**

## C.  RETALIATION CLAIMS

Lyte alleges that RWA retaliated[6] against him because he (1) took a stand on diversity issues; (2) was viewed as an ombudsman by other black employees; (3) made complaints regarding the lack of diversity awareness at RWA to Ryan, Brown, and Silverstone; and (4) filed two CHRO complaints.  Title VII prohibits an employer from "discriminat[ing] against any of his employees . . .  because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation an employee must show that "(1) the employee was engaged in a protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action."  Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996).  The same three step burden-shifting analysis applies to retaliation claims as applies to Title VII discrimination claims.  See Johnson v. Palma, 931 F. 2d 203, 207 (2d Cir. 1991).  Indeed, "On a motion for summary judgment, (1) plaintiff must demonstrate a prima facie case of retaliation, (2) defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the complained of action, and (3), if the defendant meets its burden, plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely as pretext for impermissible retaliation."  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 n.5 (2d Cir. 1998).

---

[6]  The CFEPA also makes it unlawful for employers to retaliate against their employees.  Retaliation claims brought pursuant to the CFEPA are analyzed in the same manner as Title VII retaliation claims.  See Brittell, 247 Conn. at 164.  Accordingly, the court shall discuss Lyte's Title VII and CFEPA retaliation claims concurrently.

Lyte has established a prima facie case of retaliation.  First, he has sufficiently demonstrated that he partook in protected activities.  The law protects employees in the filing of formal charges of discrimination as well as informal protests, "including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).  Indeed, "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000).  An employee is permitted to report and protest workplace discrimination whether that discrimination be actual or reasonably perceived. See Sumner, 899 F.2d at 209.  Lyte claims he engaged in the following protected activities: (1) he confronted Burns about her allegedly racially disparaging comments and whether they were "labeling"; (2) he spoke to managers, e.g., Silverstone and Ryan, about the lack of diversity at RWA and the need to advance diversity issues; (3) other black employees at RWA sought to make him their spokesman; and (4) he filed two CHRO complaints alleging race discrimination and retaliation on or about May 30, 2002 and April 2, 2003.  Lyte has produced sufficient evidence to demonstrate that he was engaged in protected activity because "[a] plaintiff need not establish that the conduct []he opposed was actually a violation of Title VII, but only that []he possessed a 'good faith, reasonable belief that the underlying employment practice was unlawful' under that statute." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 36 F.3d 276, 292 (2d Cir. 1988).  In addition, "the law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection" Cruz, 202 F.3d at 566; see

Sumner, 899 F.2d at 209 (stating that protected activities include "making complaints to management"). Lyte's conversations with Burns, Silverstone, and Ryan concerning racial sensitivity at RWA; his meetings with other black employees regarding racial issues at RWA; and his CHRO complaints qualify as protected activity because they all relate to his attempts to protest policies that he believed were discriminatory. As such, Lyte has satisfied the first prong of the prima facie case.

RWA does not dispute that it was aware of Lyte's protected activities and Lyte has produced evidence demonstrating that his employer was aware of his attempts to advance diversity at RWA and protest RWA policies that Lyte believed were discriminatory. With respect to the third element of the prima facie case, Lyte argues that he endured two adverse employment actions-termination and demotion. Lyte has offered evidence showing that he was terminated, effective June 30, 2003. Yet, to the extent Lyte argues that RWA retaliated against him by demoting him, his claim fails. As a matter of law, Lyte has not produced sufficient evidence to establish that he was demoted. Indeed, Lyte testified that his salary never changed. He also admitted that no one at RWA told him that he was being demoted. While Lyte testified that Burns assigned him projects outside of his career path and that Burns "tried to force me into skill sets where [sic] was not marketable anywhere else, and just because she was my manager she was trying to force an insubordination issue," (see dkt. # 32, Ex. 2, Lyte Dep. at 45:6-20), he has not produced evidence showing that his job duties or responsibilities changed after Burns became his supervisor. Thus, Lyte has not produced sufficient evidence to establish that RWA

demoted him. Accordingly, the court finds that Lyte has satisfied the second and third elements of the prima facie case only with respect to Lyte's retaliatory termination claim.

Lyte may also be able to prove that the adverse employment action he sustained, i.e., termination, closely followed his protected activity. "In this circuit, a plaintiff can indirectly show a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001). Courts utilize a case-by-case approach to determine whether a protected activity was closely followed by an adverse employment action. See Quinn, 159 F.3d at 769 (plaintiff established a causal connection between the protected activity and the adverse employment action when she was discharged less than two months after she filed a complaint with management and ten days after she filed a complaint with the state agency); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (eight-month gap between filing of EEOC complaint and retaliatory action suggested a causal relationship); Suggs v. Port Auth. of N.Y. & N.J., 97 civ4026 (RPP), 1999 WL 269905, at * 6 (S.D.N.Y. May 4, 1999) (termination six months after plaintiff filed an EEOC charge was "sufficiently close in time to raise an inference of retaliation"); Bernhardt v. Interbank of N.Y., 18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998) (eleven months between protected activity and termination might suggest causal link where defendant had reasons for delaying termination). Lyte may be able to establish a causal connection between filing his CHRO complaint dated April 3, 2003, and his termination, which was effective June 30, 2003, because

less than three months elapsed between these events.[7]  Thus, Lyte has satisfied the fourth prong

of the prima facie case.

Notwithstanding the foregoing, RWA has met its burden of showing that there were

legitimate, non-retaliatory reasons for Lyte's termination.  For instance, RWA has produced

documentary evidence that Lyte was terminated for (1) failing to return to work following the

expiration of his leave period; (2) failing to adhere to his schedule; and (3) exhibiting a gradual

degradation in his work over time.  As early discussed, see supra Section II.B., Lyte argues that

RWA's proffered reasons were pretextual because (1) RWA offered "varying" and "inconsistent"

reasons for his termination; (2) RWA prevented him from returning to work; (3) he adhered to

his work schedule; and (4) his work did not exhibit a gradual degradation over time.  The court

finds that none of these allegations, however, either individually or in the aggregate, suffice to

demonstrate that RWA's proffered explanations were pretext.  See supra, Section II.B.

Even assuming that Lyte could establish pretext, which he has not, Lyte's claim still fails

because he has not adduced any evidence from which a reasonable trier of fact could infer that

RWA terminated him in retaliation for his participation in protected activities.  "The final burden

rests on the plaintiff to prove not only that the proffered . . .  reason as pretextual but also that

defendant [retaliated] against the plaintiff."  Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d

---

[7]  To the extent Lyte's retaliation claim is premised upon his CHRO complaint of May 30, 2002, his claim fails.  As
more than a year elapsed between Lyte's CHRO complaint of May 30, 2002, and his termination of June 30, 2003,
Lyte is unable to establish a causal connection between the protected activity, the CHRO complaint of May 30, 2002,
and the adverse employment action, i.e., his termination.  To the extent Lyte's retaliation claim is premised upon the
emails and meetings he had with RWA managers in May, 2002, his retaliation claim fails because more than a year
passed between these protected activities, which occurred between March to April 2002, and his termination of June
30, 2003.  Furthermore, to the extent Lyte argues that there is a causal connection between the meetings he had with
other black RWA employees and his termination, this claim fails because other than vague references to these
meetings, Lyte has provided no evidence as to when these meetings occurred and to whom he spoke.

87, 91 (2d Cir. 2001). "The test for summary judgment is whether the evidence can reasonably support a verdict in plaintiff's favor." James v. New York Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000). Even if RWA's asserted reasons are false, no reasonable jury could conclude, based on the record as a whole, that Lyte's termination was retaliatory. First, although Lyte filed his CHRO complaint on April 3, 2003, RWA subsequently permitted him to return to work part-time. Indeed, Lyte returned to RWA on April 7, 2003. Lyte admits that after working only two weeks, he resumed his leave of absence. Lyte does not allege that his decision to resume his leave of absence was influenced in any way by RWA. The court finds that RWA's decision to allow Lyte to return to work part-time, after he had filed his CHRO complaint, strongly diminishes Lyte's argument that he was terminated due to impermissible retaliation.

Second, subsequent to Lyte's decision to resume his leave of absence, RWA sent him letters dated May 12, 2003 and June 23, 2003, which warned him that he had exhausted his sick leave and that he would have to return to work full-time to resume regular wages. Lyte does not dispute that he received these letters. Yet, other than his email of June 25, 2003, Lyte has failed to offer any evidence showing that he contacted RWA regarding his plans to return to work. Indeed, the record evidence indicates that RWA had not heard from Lyte since April, 2003.

Third, although Lyte concedes that he met with his superiors on June 26, 2003, and that they told him to return to meet the following afternoon at 2:00 p.m., he admits that he did not return to RWA. Nor did he attempt to call his superiors to discuss his absence from the meeting, his return to work, or inquire as to whether Brown needed more information from Dr. Murphy. In fact, there is no record evidence showing that Lyte attempted to contact RWA after June 26,

2003. A review of the entire record reveals Lyte has not produced sufficient evidence to

establish that a retaliatory animus motivated, in whole or an part, RWA's decision to terminate

him. Thus, RWA's motion for summary judgment on Lyte's retaliation claims is **GRANTED.**

## D. DISABILITY DISCRIMINATION CLAIM

Lyte claims that RWA discriminated against him on the basis of his disability in violation

of the CEFPA.[8] Section 46a-60(a) provides in relevant part:

> It shall be a discriminatory practice in violation of this section: (1) For an
> employer, by the employer or the employer's agent, except in the case of a bona
> fide occupational qualification or need, to refuse to hire or employ or to bar or to
> discharge from employment any individual or to discriminate against such
> individual in compensation or in terms, conditions or privileges of employment
> because of the individual's race, color, religious creed, age, sex, marital status,
> national origin, ancestry, present or past history of mental disability, mental
> retardation, learning disability or physical disability, including, but not limited to,
> blindness . . .

Conn. Gen. Stat. § 46a-60(a)(1). The Connecticut statute defines "mental disability" as

"refer[ring] to an individual who has a record of, or is regarded as having one or more mental

disorders." Id. § 46a-51(20). Disability discrimination claims brought under the CFEPA are

construed similarly to those brought under the Americans with Disability Act ("ADA"), see Levy

v. Comm'n on Human Rights & Opportunities, 236 Conn. 96, 103-04 (Conn. 1996), with the

Connecticut courts reviewing federal precedent concerning employment discrimination for

guidance in enforcing the CFEPA. Wroblewski v. Lexington Gardens, Inc., 188 Conn. 44, 53

(1982); Pik-Kwik Stores, Inc. v. Comm'n on Human Rights & Opportunities, 170 Conn. 327,

---

[8] A review of Lyte's complaint indicates that Lyte did not bring a claim pursuant to the Americans with Disability
Act ("ADA"). (See dkt. # 1.) The briefs filed by both parties in relation to RWA's motion for summary judgment,
however, addressed the standards set forth in the ADA.

331 (1976); <u>Ford v. Blue Cross & Blue Shield of Conn., Inc.</u>, 216 Conn. 40, 53 (1990). Indeed, Connecticut courts employ the burden shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). <u>See</u> <u>Levy</u>, 236 Conn. at 103-04. Thus, to establish a <u>prima facie</u> case, the plaintiff must prove that: (1) he is in the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. <u>Bd. of Educ. of the City of Norwalk v. Comm'n on Human Rights and Opportunities</u>, 266 Conn. 492, 505 (2003). If a plaintiff meets this initial burden of establishing a <u>prima facie</u> case of discrimination, the defendant must then offer a legitimate reason for its decision, and if it does so, the burden shifts back to plaintiff who must demonstrate pretext. <u>Ford</u>, 216 Conn. at 53-54.

Lyte has not produced sufficient evidence to satisfy his initial burden. To establish a <u>prima facie</u> case under the ADA, a plaintiff must show by a preponderance of the evidence that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." <u>Giordano v. City of New York</u>, 274 F.3d 740, 747 (2d Cir. 2001). RWA does not dispute that it is subject to the Act and that Lyte was disabled. In addition, Lyte has satisfied the third prong of the <u>prima facie</u> case. To be "otherwise qualified" the plaintiff must be "able to perform the essential functions of the job, either with or without a reasonable accommodation." <u>Borkowski v. Valley Central Sch. Dist.</u>, 63 F.3d 131, 135 (2d Cir. 1995) (citing <u>Sch. Bd. of Nassau County v. Arline</u>, 480 U.S. 273, 287 (1987)). An individual is not otherwise qualified

unless he is able, with or without reasonable accommodation, to perform the essential functions of the job in question. The term "essential functions," which is not defined in the ADA itself, is defined by the EEOC as constituting "the fundamental job duties" of the employment position in question, but not functions that are merely "marginal." Needle v. Alling & Corry, Inc., 88 F. Supp. 2d 100, 105 (W.D.N.Y. 2000) (citing 29 C.F.R. § 1630.2(n)(1) (1999)). RWA argues that, "[b]ecause the Plaintiff ultimately failed to return to work, the Plaintiff cannot establish that he could perform the essential function of his job, regardless of any accommodation." (Dkt. # 22.)

In Sista v. CDC Ixis N. Am., Inc., 445 F.3d 16 (2d Cir. 2006), the Second Circuit observed,

> We have no doubt that . . . misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee. This misconduct is distinct, however, from the issue of minimal qualification to perform a job. An individual may well have the ability to perform job duties, even if her conduct on the job is inappropriate or offensive. Accordingly, the finding of misconduct here cannot preclude [the plaintiff] from showing her qualification for employment as required by McDonnell Douglas.

Id., at 171-72. The misconduct in Sista pertained to plaintiff threatening a co-worker, whereas the alleged misconduct in the case presently before the court relates to Lyte's alleged decision to ignore his supervisors' instructions to return to work at a particular time. Both, however, relate to one's workplace behavior, and not one's ability to do his or her job. Here, Lyte has offered evidence that Dr. Murphy provided RWA with documentation that she believed Lyte could return to work full-time. Accordingly, Lyte has produced sufficient evidence to allow a reasonable trier of fact to infer that he was otherwise qualified to perform the essential functions of his job.

Lyte, however, has not satisfied the fourth prong of the prima facie case because he has not brought forth sufficient evidence to raise an inference of disability discrimination. First, to

the extent that Lyte alleges that RWA failed to accommodate him by terminating him in June 2003, instead of allowing him to work from home, the record is devoid of any evidence that Lyte made such a request.[9]  Second, although a review of the record reveals that Lyte asked RWA to allow him to return to work part-time in the spring of 2003, Lyte has not produced any evidence showing that he made a similar request after he received Brown's letters of May 12, 2003 and June 23, 2003.  The letter of May 12, 2003 informed Lyte that he had exhausted his sick time pay and would have to return to work full-time to resume regular wages, and Brown's letter of June 23, 2003 informed Lyte that he would be terminated effective June 30, 2003, unless he was able to return to work on a full-time basis and satisfactorily perform the essential duties of his job. Third, although Lyte returned to work on June 26, 2003, and met with Ryan and Brown, he was instructed to leave the premises, get a release from his doctor, and return to work the following day.  Lyte partially complied with this directive, as he left the premises and obtained a release from Dr. Murphy, which stated that Lyte could return to work full-time.  Although Brown subsequently asked Dr. Murphy if Lyte would be "completely functional" when he returned to work, Brown's request was proper because the ADA permits an employer "to make inquiries into

_____

[9]A review of the record reveals that Lyte made a request for remote access in June, 2002.  The record is devoid of any evidence that Lyte thereafter made a subsequent request.  Furthermore, to the extent Lyte's disability claim is premised upon his June, 2002 request for remote access, his disability claim fails because the record does not support Lyte's contention that this request for remote access was made in connection with any disability.  Although Lyte's affidavit indicates that asked RWA for remote access in June, 2002, a search of the record reveals that Lyte did not seek leave for his disability until November, 2002.  In addition, Lyte has not offered any evidence indicating that he informed RWA of his disability in June, 2002.  RWA cannot be found to have failed to accommodate Lyte's disability in June, 2002, because RWA was unaware at the time that Lyte was disabled.  See Bedor v. Friendly's Ice Cream Corp., 392 F. Supp. 2d 367, 381 (D. Conn. 2005) (observing that CFEPA, like the ADA, requires that the defendant's adverse actions be based on the plaintiff's disability, and finding that when plaintiff did not produce evidence that the defendant knew of the plaintiff's dysfunction at the time defendant took an adverse employment action, plaintiff's CFEPA claim failed as a matter of law).

the ability of an employee to perform job-related functions." Dietrich v. E.I. Du Pont De Nemours, No. 02-cv-678S, 2004 WL 2202656, at * 5 (W.D.N.Y. Sept. 28, 2004); see also 42 U.S.C. § 12112(d)(4)(B). To the extent Lyte argues, "[t]here is no record evidence that Brown followed up with Dr. Murphy to satisfy any doubts that he may have regarding Plaintiff's ability to perform the essential function of his job," Lyte's argument is without merit. Lyte admits that he did not return for the scheduled meeting on June 27, 2003. Nor has Lyte offered evidence that he thereafter contacted Brown regarding his medical release. Indeed, the evidence indicates that other than providing Brown with Dr. Murphy's initial medical release of June 26, 2003, Lyte made no attempts to make arrangements for his return to work. Moreover, Lyte testified that he "had no intentions [sic] of going back to RWA. . . ." (Dkt. # 22, Ex. B, Lyte Dep. at 145:2-6.) Accordingly Lyte has not offered sufficient evidence to show that he was terminated because of his disability.

Even assuming arguendo that has established a prima facie case disability discrimination, Lyte has not satisfied his ultimate burden. Under the McDonnell Douglas framework, as noted above, Lyte has the burden of the putting forth evidence from which a reasonable juror could infer that RWA's articulated, non-discriminatory reasons were a mere pretext for disability discrimination. "The plaintiff then must satisfy [his] burden of persuading the factfinder that []he was the victim of discrimination 'either directly by persuading the court [or jury] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Ford, 216 Conn. at 54 (quoting

<u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)).  As previously discussed, Lyte was unable to show that RWA's articulated, non-discriminatory reasons were a mere pretext for disability discrimination.  <u>See</u> <u>supra</u> Section II.B.  Moreover, other than his membership in the protected class Lyte has offered no evidence from which a reasonable jury could infer that he was terminated because of his disability.  The record evidence reveals that RWA permitted Lyte to return to work part-time in April, 2003, and then sent Lyte two letters warning Lyte that he had used up his sick time and would have to return to work full-time in order to resume regular wages.  Lyte did not contact RWA until June 25, 2006.  In addition, the record reveals that between April, 2003 and June, 2003 Lyte did not ask RWA for any reasonable work accommodations.  Furthermore, although Lyte returned to work on June 26, 2003, and provided Brown with Dr. Murphy's note, which cleared Lyte to return to work full-time, Lyte did not return to work for the meeting of June 27, 2003.  Accordingly, a review of the entire record reviews that a reasonable jury simply could not conclude that disability discrimination motivated, in whole or in part, RWA's decision to terminate Lyte.  Rather, it was Lyte who decided not to return to RWA.  Thus, RWA is entitled to summary judgment on Lyte's disability discrimination claim.

### III. CONCLUSION

For the foregoing reasons defendant's motion for summary judgment (**dkt. # 22**) is

**GRANTED**.  Judgment shall enter for the defendant on all counts of the complaint.  The Clerk

of the Court shall close this file.


So ordered this ___9th____ day of April, 2007.


**/s/DJS**
_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**